IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| ANNETTE H. WILSON,<br><br>              Plaintiff,<br><br>vs.<br><br>QUINETTE DUNN, KENNETH ERICKSON, individually and as TRUSTEE OF THE KENNETH R. ERICKSON LIVING TRUST, BARBARA ERICKSON, individually and as TRUSTEE OF THE BARBARA H. ERICKSON LIVING TRUST, THE BARBARA H. ERICKSON LIVING TRUST, and THE KENNETH R. ERICKSON LIVING TRUST,<br><br>              Defendants. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br>Case No. 2:12-CV-599-TC |

Plaintiff Annette Wilson seeks to enforce a court judgment she obtained in an Arizona court against Defendants Kenneth and Barbara Erickson by attaching the Ericksons' assets, including what she contends is the Ericksons' home in Draper, Utah (the Property). She asks this court to invalidate the Ericksons' transfer of the home (accomplished by a quitclaim deed through two *inter vivos* trusts) to their daughter, Defendant Quinette Dunn,[1] on the basis that the transfer violated the Utah Fraudulent Transfer Act (UFTA).

The parties have filed cross-motions for summary judgment. For the reasons set forth

---

[1] Ms. Wilson can pursue Ms. Dunn as the "first transferee of the asset or the person for whose benefit the transfer was made." See Utah Code Ann. § 25-6-9(2)(a).

below, the court finds that the Defendants transferred the Property to Ms. Dunn, in violation of the UFTA, to prevent Ms. Wilson from using the Property to satisfy the monetary judgment. Accordingly, Plaintiff's motion is GRANTED and Defendants' motion is DENIED.

## **FACTUAL BACKGROUND**[2]

In April 2002, Plaintiff Annette Wilson sold her business, Designer Doors, Inc., to a group of individuals including Defendants Kenneth and Barbara Erickson. In connection with the purchase of Designer Doors, Inc., the Ericksons and the other purchasers executed two promissory notes (the Notes)—one for $949,000 and one for $551,000—which were secured by a personal guaranty signed by the Ericksons and the other purchasers (collectively, the Guarantors). The $1.5 million remainder of the $3.5 million purchase price was covered by the Notes. Later, the Ericksons paid $551,000 to Ms. Wilson to satisfy one of the Notes. The $949,000 Note remained unpaid.

In June 2007, the Ericksons purchased a home in Draper, Utah (the Draper Home) and immediately transferred the Property to the Barbara H. Erickson Living Trust (the B. Erickson Trust). The B. Erickson Trust, created in 1999, is a self-settled revocable *inter vivos* trust. Ms. Erickson is the settlor, trustee, and beneficiary of the trust during her lifetime.

In 2007, the Guarantors' business filed for Chapter 11 bankruptcy, and the Guarantors negotiated with Ms. Wilson and modified the guarantor agreement. They agreed that the Ericksons would pay $31,878 to Ms. Wilson and that the outstanding balance was $473,354.71. For two years, the Ericksons were only required to make monthly interest payments of $3,945 to

---

[2]Despite the Ericksons' assertion, the court finds that no genuine disputes of material facts exist, as the court will note throughout the order.

Ms. Wilson. But in 2008, the business's bankruptcy was changed to a Chapter 7 liquidation. At that point, Ms. Wilson looked to the Guarantors for payment on the remaining Note balance. The Ericksons paid $256,677 to Ms. Wilson, which left a balance on the Note of $216,677.35.

In 2008, when the Ericksons and other Guarantors failed to pay the outstanding balance on the Notes, Ms. Wilson filed suit in Arizona state court (the Arizona Action) against the Ericksons.

On November 2, 2009, Barbara Erickson, as trustee of the B. Erickson Trust, executed a quitclaim deed transferring the Draper Home to the B. Erickson Trust and The Kenneth R. Erickson Living Trust (the "K. Erickson Trust") (also created in 1999), as joint tenants. The K. Erickson Trust is a self-settled revocable *inter vivos* trust. Mr. Erickson is the settlor, trustee, and the beneficiary of the trust during his lifetime.

On January 1, 2010, the Ericksons, as trustees of their respective Trusts, transferred the Draper Home to their daughter, Quinette Dunn, through a quitclaim deed. They did not record the transfer at that time, so the transfer was not publicly announced.

On February 17, 2011, the Arizona court entered a judgment against the Ericksons totaling approximately $280,000 (which consisted of the remainder of their obligation under the Notes plus attorneys' fees and interest). Ms. Wilson is attempting to satisfy the judgment by attaching the Draper Home.

While the Arizona Action was pending, the Draper Home was initially an asset jointly held by the two Trusts. The Trusts (which were joint tenants of the Draper Home), are named as Defendants in this case. If the court accepts the Ericksons' proffer that the transfer occurred on January 1, 2010, the asset was later held by Quinette Dunn during the Arizona Action.

On October 11, 2011, after judgment was entered in the Arizona Action, the Ericksons recorded the quitclaim deed. Ms. Wilson asserts that the Property was transferred after judgment was entered because the quitclaim deed was not recorded until then. The Ericksons contend, however, that the transfer of property actually occurred on January 1, 2010, when they executed (but did not record) the quitclaim deed. The parties' dispute over the date of transfer is not material, as explained below.

The Ericksons transferred the Property to their daughter in exchange for her promise of future care.[3] Ms. Dunn did not give anything else to her parents in exchange for the Property. At the time of the Property transfer, Ms. Dunn had no work experience, professional training, or business in nursing or personal care. In addition, Ms. Dunn lives in Arizona part time, while her parents continue to live in the Draper Home full-time, rent free. She does not care for her parents full time.

According to Ms. Wilson's expert witness, Barbara M. Smith (a CPA and valuation expert),[4] the Ericksons were insolvent at the time the Property was transferred to Ms. Dunn,

---

[3]According to the Defendants, after Ms. Dunn's husband suffered a debilitating stroke, the Ericksons and their son Trent (who handles the Ericksons' finances), began "discussing the possibility of whether the trust should gift the Ericksons' residence to Quinette Dunn only, rather than all of the children. After many discussions the Ericksons and Trent conclude[d] that this would help resolve two issues that worried them both: 1) Quinette, being their only daughter, would be able to help care [for] the Ericksons in their declining years in familiar surroundings and 2) Quinette would also have a place to take care of her now disabled husband." (Defs.' Mot. Summ. J. (Doc. No. 31) ¶ 31.)

[4]The Ericksons, in their opposition to Ms. Wilson's motion for summary judgment, challenge the validity of Ms. Smith's opinion. (See Defs.' Opp'n Mot. Summ. J. (Doc. No. 30) at 32-35.) They ask the court to strike the Report based on what they characterize as legal conclusions in the Report. They also contend that the facts used by Ms. Smith are inaccurate. But Ms. Smith's report does not offer legal opinions. She offers an opinion on the Ericksons' solvency. And the alleged contradictory facts provided by the Ericksons (see id. at 33-34), do not

4

whether one considers the January 1, 2010 date or the October 11, 2011 date.[5] (See Expert Report of Barbara M. Smith (Pl.'s Ex. 13, Doc. No. 23-1) (Smith Report) at 1, 9-11; Supplemental Expert Report of Ms. Smith (Pl.'s Ex. 15, Doc. No. 39) (Smith Rebuttal Report) at 1-2.) Regardless of the date of transfer, the Ericksons' debt to Ms. Wilson had been incurred under the Notes and the Ericksons were aware, or should have been aware, of their obligation to Ms. Wilson.[6]

The Ericksons attempt to challenge Ms. Smith's conclusion through an affidavit of their son, Trent Erickson, who handles his parents' finances. In his affidavit, he sets forth information about his parents' finances and opines on his parents' net worth at the time of transfer (he contends it was $583,353, which would be sufficient to pay off the judgment without becoming insolvent). (See Aff. of Trent Erickson (Doc. No. 30-3).) But his conclusion is unallowed expert opinion (the Ericksons did not submit an expert report by the disclosure deadline) and so the court will only consider Trent Erickson as a fact witness. Still, even if the court were to consider his opinion testimony regarding the value of the Trent Note and the Sally Note (other assets of

---

make Ms. Smith's analysis and opinion unreliable, because Ms. Smith took the new facts into consideration and concluded that those facts do not change her opinion.

[5]The Ericksons contend that a genuine issue of material fact exists about whether the property was transferred on January 1, 2010, or October 11, 2011. (See Defs.' Opp'n Mot. Summ. J. (Doc. No. 30) at 29-30.) The dispute is not material because the conclusion of insolvency applies regardless of which date is considered.

[6]The Ericksons note that other Guarantors had an obligation to pay the remaining balance owed. (See Pl.'s Opp'n to Defs.' Mot. Summ. J. (Doc. No. 30) ¶¶ 24-25.) But that is irrelevant because the Arizona court entered a judgment against them (and other Guarantors), imposing joint and several liability. (Feb. 7, 2011 Judgment, attached as Ex. 1 to Pl.'s App'x of Exs. (Doc. No. 23).) Moreover, at the time the Arizona law suit was filed, the Ericksons were aware that Ms. Wilson was seeking the remedy from them, not just the other Guarantors.

5

the Ericksons), Ms. Smith's expert valuation discounting those notes (see Smith Rebuttal Report) is persuasive and provides a logical, informed opinion about why Trent Erickson's opinion about net worth is incorrect.

At the time of the October 2011 quitclaim deed recording, the Ericksons had $15,400 available to satisfy the $280,000 judgment owed to Ms. Wilson. (See Smith Report at 11.) Ms. Smith, analyzing the Ericksons' solvency on January 1, 2010, opines that the Ericksons had $117,378, available to satisfy a potential adverse judgment of approximately $280,000. (Id. at 10.) In either scenario, the Ericksons did not have assets sufficient to pay the judgment.[7] They were insolvent on both dates. See Utah Code Ann. § 25-6-3(1)-(2) (defining insolvency for a debtor under the UFTA) (cited in Smith Report at 1).

## ANALYSIS

Both the Plaintiff and the Defendants seek summary judgment from the court under Rule 56 of the Federal Rules of Civil Procedure. Under Rule 56, a party is entitled to summary judgment if he demonstrates, through pleadings, depositions, answers to interrogatories, admissions on file, or affidavits, that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when, after viewing the record and making all reasonable inferences in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248

---

[7]The Ericksons contend that a genuine issue of material fact exists concerning whether they were insolvent. (See Defs.' Opp'n Mot. Summ. J. (Doc. No. 30) at 30-31.) They point to factual information provided by Trent Erickson in his Affidavit. But Ms. Smith, in her rebuttal report, takes those very facts into account and reaches the same conclusion. No genuine dispute exists that would require submitting the question to a jury.

(1986).

The opposing party's response must set forth specific facts showing a genuine issue for trial, and it "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient." Anderson, 477 U.S. at 252.

## FRAUDULENT TRANSFER[8]

Ms. Wilson contends that the Draper Home is an asset of the Ericksons (not the Trusts) and that they fraudulently transferred that asset to Quinette Dunn to avoid paying the judgment against them.

A. **The Property Was an Asset of the Ericksons Even Though It Was Held In Trust Before The Transfer.[9]**

To succeed on her UFTA claim, Ms. Wilson (the Creditor) must first show that the Property, at the time of transfer,[10] was an asset of the Ericksons (the Debtor) that would be subject to attachment by Ms. Wilson. See Utah Code Ann. § 25-6-2(2) (defining "asset" as "property of a debtor"). The Ericksons assert that at the time of the transfer, the Property was not

---

[8]Ms. Wilson also brings a claim for unjust enrichment. That claim was not briefed by the parties in their cross motions for summary judgment. In any event, the unjust enrichment claim is moot based on the court's ruling and so it is hereby dismissed.

[9]The Ericksons contend that a genuine issue of material fact exists concerning the issue of ownership. (See Defs.' Opp'n to Pl.'s Mot. Summ. J. (Doc. No. 30) at 28-29.) But they do not point to anything in the record that creates such a dispute (see id.), nor does the court see any contradictory evidence in the record.

[10]There is no dispute that the Property was transferred to Ms. Dunn. See Utah Code Ann. § 25-6-12 (defining "transfer" as "every mode, direct or indirect, absolute or conditional, or voluntary or involuntary, or disposing of or parting with an asset or an interest in an asset . . . .").

an asset of the Ericksons but was an asset of the two revocable trusts and that the trusts are entities distinct from the Ericksons. Similarly, they argue that the Trusts were not signatories to the personal guaranty agreement and so have no liability under the Notes. Accordingly, they argue, the Property is out of Ms. Wilson's reach.

It is well settled under Utah law that self-settled revocable trusts cannot be used to shield assets from creditors. "(1) Whether or not the terms of a trust contains a spendthrift provision, the following rule[ applies]: (a) During the lifetime of the settlor, the property of a revocable trust is subject to the claims of the settlor's creditors. . . ." Utah Code Ann. § 75-7-505. This statute applies here.

The Ericksons contend that this statute, which was enacted in 2004, does not apply to the Trusts, because the Trusts were created in 1999 and there is no indication that the statute is retroactive. Regardless of whether the statute is retroactive, the relevant events to which it applies (failure to pay the Notes in full, transfer of the Property into the Trusts, the lawsuit by Ms. Wilson, and the execution of the quitclaim deed transferring the Draper Home to Quinette Dunn) occurred after the statute was enacted. Moreover, the statute expressly states that it applies "during the lifetime of the settlor," and it does not distinguish between trusts in existence at the time the provision was enacted and trusts that were created after the statute went into effect. Finally, the concept the statute articulates is one that existed in common law and in other statutory form long before Section 75-7-505 was codified. See Leach v. Anderson, 535 P.2d 1241, 1243 (Utah 1975) (discussing Utah Code Section 25-1-11 (no longer in effect) that dealt with fraudulent conveyances and stating that "[t]he intent and the effect of the statute is to prevent a person from using a trust as a device by which he can retain for himself and enjoy

8

substantially all of the advantages of ownership and at the same time place it beyond the legitimate claims of his creditors.").

Based on the foregoing, the court concludes that the Property was an asset of the Ericksons at the time it was transferred to Ms. Dunn.

**B.    The Transfer Was Fraudulent Under The UFTA.**

Ms. Wilson claims that the transfer of the Property was fraudulent under one or more of three independent sections of the Utah Fraudulent Transfer Act: Utah Code Ann. §§ 25-6-5(1)(a), 25-6-5(1)(b), 25-6-6(1).  In the first provision, the debtor is liable if he made the transfer "with actual intent to hinder, delay or defraud" any of his creditors.  Utah Code Ann. § 25-6-5(1)(a) (emphasis added) **[hereinafter "Section 5(1)(a)"]**.  In the second provision, the debtor is liable if he made the transfer "without receiving a reasonably equivalent value in exchange for the transfer or obligation" and the debtor "intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due."  Utah Code Ann. § 25-6-5(1)(b) (emphasis added) **[hereinafter "Section 5(1)(b)"]**.  See also id. § 25-6-3(1) ("A debtor who is generally not paying his debts as they become due is presumed to be insolvent.").  In the third provision, a transfer is fraudulent if the debtor "made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation" and "the debtor was insolvent at the time or became insolvent as a result of the transfer or obligation."  Utah Code Ann. § 25-6-6(1) (emphasis added) **[hereinafter "Section 6(1)"]**.  Actual intent is not relevant under this section.  Tolle v. Fenley, 132 P.3d 63, 68 (Utah Ct. App. 2006).

The court holds, for the reasons set forth below, that the Ericksons are liable under

9

Sections 5(1)(b) and 6(1).

### 1. The Transfer Was Fraudulent Under Section 6(1).

Under this section of the UFTA, a party is liable if the debtor made the transfer without receiving a reasonably equivalent value in return and the debtor was insolvent at the time of the transfer (or as a result of the transfer). Utah Code Ann. § 25-6-6(1)(a)-(b).

a. *Reasonably Equivalent Value*

The value of the consideration given by Quinette Dunn was not reasonably equivalent to the value of the Draper Home. In exchange for the Draper Home, Quinette Dunn promised future care to her parents. According to the Ericksons, Ms. Dunn's promise was consideration reasonably equivalent to the Property's value. But the undisputed facts, when considered with the plain language of the UFTA, negate the Ericksons' argument.

The UFTA specifically prohibits the promise of future care from satisfying the reasonably equivalent value requirement unless the provider of that care is in the business of providing such care.

> Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent is secured or satisfied. However, <u>value does not include an unperformed promise</u> made <u>other than</u> in the ordinary course of the promisor's <u>business</u> to furnish support to the debtor or to another person.

Utah Code Ann. § 25-6-4(1) (emphasis added). Ms. Dunn does not have a business to provide care to or furnish support for others.

Defendants rely on <u>In re Pawlak</u>, 483 B.R. 169 (Bankr. W.D. Wis. 2012), to argue that the exception applies here. But <u>Pawlak</u> is factually distinguishable. In <u>Pawlak</u>, the Pawlaks paid a $50,000 retainer fee to the defendant law firm in exchange for promised legal services. While

the law firm was in the business of providing legal services, Ms. Dunn is not in the business of providing personal physical care to individuals.

Moreover, as Ms. Wilson points out, the Ericksons also provided the Draper Home to Ms. Dunn "to continue to help her take care of [her disabled husband]." (Dec. 18, 2009 Letter from Ericksons to Ericksons' children, Ex. 3 of Pl.'s App'x.) This economically benefits Ms. Dunn and her husband, not the Ericksons.

All of these factors demonstrate that the consideration given by Ms. Dunn was not reasonably equivalent to the Draper Home.

   b.   *Insolvency*

Regardless of the date the court relies on to determine the question of insolvency, the court finds that the Ericksons were insolvent at the time of transfer. The court's conclusion is the same whether the court analyzes the issue using the January 1, 2010 date (when the quitclaim deed was executed) or the October 11, 2011 date (when the quitclaim deed was recorded). The court relies on the expert opinion of Barbara Smith, who opines that the Ericksons were insolvent at both times and backs up her opinion with undisputed facts and reliable conclusions.

Based on the foregoing, the court finds that the Ericksons are liable for a fraudulent transfer under Section 6(1) and may not avoid paying Ms. Wilson's judgment against them by transferring the Draper Home to their daughter, Quinette Dunn.

   **2.   The Transfer Was Fraudulent Under Section 5(1)(b).**

Under the UFTA, a debtor may be liable if he transfers the property without receiving a reasonably equivalent value in exchange, and he "intended to incur, or believed or <u>reasonably should have believed</u> that he would incur, debts beyond his ability to pay as they became due."

11

Utah Code Ann. § 25-6-5(b)(ii) (emphasis added). The court has already discussed why the Ericksons did not receive reasonably equivalent value in exchange for the Property. The information in Ms. Smith's Report (that the Ericksons did not have funds to pay their debts when the debts became due), as well as the Ericksons' financial problems discussed in the record, show that they reasonably should have believed that they would incur debts beyond their ability to pay when they transferred the Draper Home to Quinette Dunn. Accordingly, the transfer was also fraudulent under Section 5(1)(b).

### 3. The Question Of Fraudulent Transfer Under Section 5(1)(a).

The court does not reach the issue of whether the transfer was fraudulent under Section 5(1)(a), which requires an analysis of whether the Ericksons had "actual intent" to defraud. The Ericksons insist, citing to the sworn testimony of Trent Erickson, Kenneth Erickson, and Quinette Dunn, that they did not transfer the Property "in order to keep the Property away from Wilson or anyone else." (Defs.' Cross Mot. Summ. J. (Doc. No. 31) ¶ 43.) Still, it appears that the bulk of evidence before the court supports a finding of actual intent to defraud.

Direct evidence of intent to defraud is rarely available, so courts may rely on circumstantial evidence to infer fraudulent intent. And the UFTA provides a non-exhaustive list of factors for courts to consider when determining whether there was actual intent to defraud. Of the eleven factors listed, seven of them apply to the Ericksons' case, including (1) whether the transfer or obligation was to an insider (the transfer was to their daughter); (2) whether the debtor retained possession or control of the property transferred after the transfer (the Ericksons continued to live in the Draper Home after the transfer); (3) whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit (the Arizona Action

was pending at the time the quitclaim deed was executed); (4) whether the transfer was of substantially all the debtors' assets (according to the Smith Report, the Draper Home was the most significant asset and what was left after the transfer was relatively insignificant); (5) whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred (as noted above, the Ericksons did not get reasonably equivalent value); (6) whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred (Ms. Smith's expert report establishes the Ericksons' insolvency); and (7) whether the transfer occurred shortly before or shortly after a substantial debt was incurred (the transfer occurred either during the Arizona Action or only months after entry of the $280,000 judgment). Utah Code Ann. § 25-6-5(2).

Mr. Erickson, Trent Erickson, and Quinette Dunn each state during their depositions that they did not intend to defraud anyone when the Draper Home was transferred to Quinette Dunn by quitclaim deed. (See Defs.' Cross Mot. Summ. J. (Doc. No. 31) ¶ 43.) In the context of summary judgment, where the court may not judge credibility and must consider facts in a light most favorable to the non-movant, the issue of fraudulent intent under Section 5(1)(b) is not as clear. But, because the court finds that the transfer was fraudulent under the other two provisions of the UFTA, the court need not reach the question under section 25-6-5(1)(a).

## **ORDER**

For the foregoing reasons, the court ORDERS as follows:

1.      Plaintiff Annette H. Wilson's Motion for Summary Judgment (Doc. No. 22) is GRANTED and the Defendants' Motion for Summary Judgment (Doc. No. 31) is DENIED.

2.	As allowed under Utah Code Ann. § 25-6-8(1), in the event of a fraudulent transfer (as the court has found here), the creditor is entitled to an avoidance, attachment, and injunction.  Accordingly, the court GRANTS the relief Plaintiff Annette Wilson requests in her Motion for Summary Judgment (<u>see</u> Doc. No. 20 at p. 22).  Ms. Wilson is hereby entitled to (a) an avoidance of the transfer to the extent necessary to satisfy her claim; (b) an attachment or other provisional remedy against the Property in accordance with the procedure prescribed by the Utah Rules of Civil Procedure; and (c) an injunction requiring the Ericksons and Quinette Dunn to refrain from further disposition of the Property.

3.	The Clerk of the Court is directed to close the case.

DATED this 6th day of May, 2014.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge